IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MATTHEW MORRISON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A.No. 22-_____ |
| | : | |
| THE NEMOURS FOUNDATION, a Florida | : | Jury Trial Demanded |
| Corporation, | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT

1. This is a termination case arising from intentional religious discrimination in violation of the most favored nation principle required under Title VII of the Civil Rights Act of 1964. In the words of the U.S. Supreme Court,

> Title VII does not demand mere neutrality with regard to religious practices – that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not to fail or refuse to hire or discharge any individual because of such individual's religious observance and practice.

E.E.O.C. v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768, 775 (2015) (cleaned up). The Third Circuit has long recognized this same principle. See Fraternal Order of Police Newark Lodge No. 12 v. City of Newark, 170 F.3d 359, 365 (3d Cir. 1999) (rejecting the claim that an employer can ignore religious accommodations under Title VII while at the same time making medical accommodations under the Americans with Disabilities Act).[1]

---

[1] This same principle has long been recognized and applied in the First Amendment context, where it similarly bars the accommodation of non-religious interests when the accommodation of analogous religious interests are denied. See, e.g. Fulton v. City of Phila., 141 S.Ct. 1868, 1879 (2021); Tandon v. Newsom, 141 S.Ct. 1294, 1297 (2021)(per curiam); Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S.Ct. 63, 66-67 (2021) (per curiam);

2. Plaintiff was a long term emergency department nurse manager flow supervisor in Defendant's children's hospital who applied for a religious exemption from its Covid-19 vaccination mandate because of central sincerely held religious beliefs mandated by his large world wide religious denomination. His religious beliefs were denied while Defendant's written policies allowed and preferred exemptions for medical reasons in violation of the neutrality required by Title VII of the Civil Rights Act of 1964. Plaintiff seeks compensatory and punitive damages.

## I. JURISDICTION AND VENUE

3. The jurisdiction of this Court is invoked pursuant to 28 *U.S.C.* §§ 1331 and 1343; 42 *U.S.C.* § 1981a; and Title VII of the Civil Rights Act of 1964, as amended, 42 *U.S.C.* § 2000e et seq. ("Title VII").

4. The cause of action arises under Title VII.

5. All conditions precedent to jurisdiction have occurred or have been complied with. Plaintiff was constructively discharged and forced under duress to resign on October 5, 2021 and he filed a timely administrative complaint with the United States Equal Employment Opportunity Commission ("EEOC") on December 28, 2021. All administrative proceedings have been terminated. The EEOC issued Plaintiff by email a Notice of Right to Sue dated 9/17/22, notice of which was received by email on that same date. This Complaint is being filed within 90 days of receipt of such Notice.

6. Venue is proper in this district because it is the judicial district where Plaintiff

---

Tenafly Eruv Ass'n v. Borough of Tenafly, 309 F.3d 144, 166-67 (3d Cir. 2002); F.O.P. Lodge 12, 170 F.3d at 365-66.

was employed, the unlawful employment practices and the discrimination complained of occurred, and the claims arose.

## II. THE PARTIES

7. At all times material hereto Plaintiff was a member in good standing of the Christian religious denomination known as the Assemblies of God, with over 70 million members and more than 368,000 churches worldwide. His local pastor confirmed this membership in writing to Defendant on August 10, 2021 with links to appropriate church teachings. Plaintiff believes this is the largest Evangelical Christian organization on Earth.

8. Since becoming a Christian in 2002, in addition to his professional medical career, Plaintiff founded a missionary organization known as "Mission for Life" which provided in foreign countries, such as Mexico, medical, humanitarian and evangelical religious relief to the impoverished.

9. From February 11, 2008 to October 5, 2021 he was employed by Defendant as a Registered Nurse in the Emergency Department. His last position was as the Emergency Department Patient Flow Supervisor, a manager with supervisory duties.

10. At all times material hereto, Plaintiff was a diligent, honest, and loyal employee who always performed his job in an exemplary manner.

11. Defendant The Nemours Foundation (hereinafter "Defendant") is a not for profit Florida corporation. Defendant is authorized to conduct business and does conduct business in the State of Delaware. Its registered agent in Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. Defendant operates Nemours Children's Health and Nemours Children's Hospital, Delaware at the property often

referred to as Nemours, located in Brandywine Hundred, New Castle County, Delaware. These were formerly known as, and are still regularly referred to as, the Alfred I. duPont Hospital for Children, and various similar names. The renaming and rebranding occurred in 2021 which itself followed certain amendments, occurring approximately over the last decade, both to Defendant's Articles of Incorporation and to the Testamentary Trust established under the will of the late Alfred I. duPont.

12. Defendant is part of one of the largest integrated pediatric health systems in the country. Its medical care is focused on children.

13. At all times material hereto, Defendant had over 500 employees. Defendant is a covered employer under Title VII.

### III.  FACTS GIVING RISE TO THE ACTION

**A.  The Covid-19 Pandemic Vaccination Policy**

14. In August of 2021 Defendant notified its employees that they all had to be vaccinated by October 7, 2021 against Covid-19 or be terminated.

15. Defendant's written policy allowed two exemptions: (1) for a documented medical contraindication, (for a "qualifying medical conditions" in Defendant's counsel's words to the EEOC on April 20, 2022 ), or (2) for a sincerely held religious belief that conflicts with receiving the vaccine if (i) the belief were sincerely held, (ii) is actually religious in nature, and (iii) the employer actually agreed that receiving the vaccine conflicts with the belief.

16. These last two caveats contradicted longstanding case law which does not permit the assessment of the truth or falsity of religious beliefs. See Thomas v. Review Bd. of Ind. Employment Security Div., 450 U.S. 707, 714 ("religious beliefs need not be acceptable, logical,

consistent, or comprehensible to others in order to merit First Amendment protection."); accord Fulton, 141 S.Ct. at 1876.

17. In the Third Circuit Defendant also could not deny or challenge the self evident nature of Plaintiff's religious beliefs or his sincerity. See Tenafly Eruv Assn v. Borough of Tenafly, 309 F.3d 144, 171 (3d Cir. 2002)(belief sincerely held and religious in nature); DeHart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000); Africa v. Pa. 662 F.2d 1025, 1029 (3d Cir. 1981).

**B.   The Application**

18. On August 11, 2021 Plaintiff submitted four pages of written documentation for a religious exemption from the vaccination, and provided six links to supporting medical references demonstrating his sincerely held religious belief that the vaccines available can be traced to aborted fetal cells and their use would be a moral wrong, a grievous sin in the eyes of God and contrary to the teachings of the Bible and his religious denomination..

19. In his written submission, he explained, in depth, the teachings of the Assemblies of God from its Social Life Document and other sources condemning as sinful and immoral the use of any aborted fetus in attempts to treat various diseases.

20. Plaintiff then from the scientific literature identified the abortion-derived cell lines underlying the Pfizer and BioNTech vaccine (HEK-293), Moderna (HEK-293), and the Johnson & Johnson (PER.C6) vaccines.

21. Plaintiff concluded - "I am sincerely in alignment with my faith as I have continually demonstrated outwardly through the mission's ministry and through the power of the Holy Spirit let it be known that by receiving the vaccines mentioned above, I would be participating in the sin of abortion, thereby resulting in my spiritual death. . . . my religious beliefs prevent me from

being subject to the COVID19 Vaccine, especially as a Christian. It is contradictory to my faith no matter how you look at it. For these reasons I am requesting, . . . an exemption."

22. On August 26, 2022, Defendant denied the application concluding that the Moderna and Pfizer vaccines use of fetal stem cells was limited to testing only, and so it would not be sinful for Plaintiff to put those vaccines in his body.

23. Apparently under caveats (ii) and (iii) of its policy Defendant concluded that Plaintiffs beliefs were not religious or the vaccine did not conflict with his religion.

24. Plaintiff's sincerity seems not to have been questioned. Instead, his secular employer, Defendant, took it upon itself to: (1) analyze Plaintiff's religious beliefs and practices; (2) explain to him the religious beliefs and practices of a different religion that it preferred; and (3) reject Plaintiff's religious beliefs and practices.

25. Inexplicably and impermissibly, in making its denial Defendant appears to have relied on the religious beliefs and teaching of the Roman Catholic Church and expressed its strong preference for such religious beliefs and teachings over Plaintiff's actual religious beliefs and teachings of his entirely different Assembly of God religion to which he has dedicated his life.

26. Defendant claimed that "Pope Francis, the leader of the Roman Catholic Church, ha[s] strongly encouraged members of their faith communities to receive a COVID-19 vaccination. The U.S. Conference of Catholic Bishops has explained that receiving the Pfizer and Moderna vaccines is consistent with the Catholic faith because the Pfizer and Moderna vaccines did not use fetal cell lines for their "design, development, or production," and the connection between those vaccines and abortion "is very remote."

27. Plaintiff replied – "Mandating the use of the Pfizer and Moderna vaccine that has knowingly participated in the use of aborted fetal tissue during production through testing is a direct violation of my faith. My faith does not have a 'testing only' clause for committing sin."

28. On October 5, 2022 Plaintiff was constructively discharged and was forced to resign because of his religion.

## IV. INJURIES AND DAMAGES

29. As a result of the discriminatory treatment he experienced, Plaintiff is suffering from emotional distress which is or has been marked by insomnia; lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; feelings of agitation, irritability, and anger with himself and others; flashbacks; nightmares; and weight gain.

30. As a direct and proximate cause of Defendant's actions, Plaintiff has suffered the decreased benefits of employment, lost wages, decreased employment and earnings opportunities, reduced pension, lost life insurance, and other lost employment benefits exceeding $1.5 million dollars; medical expenses; humiliation, embarrassment, injury to reputation, severe emotional distress; and other pecuniary and non-pecuniary losses and permanent injuries.

## V. OTHER ALLEGATIONS REGARDING DEFENDANT'S CONDUCT

31. The actions of the Defendant were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of federally protected rights.

32. Defendant either knew or showed a negligent or reckless disregard for the matter of whether its conduct violated federal rights.

33. Its actions were outrageous and taken with evil or improper motive, in bad faith, out

of personal animus, or motivated by bias and without any reasonable grounds to support them.

34. Its actions were wanton and malicious or taken with reckless indifference to rights protected under federal law.

35. Plaintiff's religion made a difference in all actions adverse to him.

36. Plaintiff's religion, and/or protected activity was a motivating or determinative factor in all actions adverse to him.

## VI.  CLAIMS

### COUNT I (Title VII - Religion:  Violation of the "Favored Treatment" Principle in Allowing Medical Exemptions, but Not Religious Exemptions)

37. Plaintiff repeats and realleges all paragraphs set forth above.

38. As already noted above, Title VII requires that Defendant provide favored treatment to religious practices.  As the Supreme Court has unequivocally stated –

> Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not to fail or refuse to hire or discharge any individual because of such individual's religious observance and practice.

Abercrombie & Fitch, 575 U.S. at 775 (cleaned up).  Put simply –

> when an [employee] requires an accommodation as an aspect of religious practice, it is no response that the subsequent [discharge] was due to an otherwise-neutral policy. Title VII requires otherwise-neutral policies to give way to the need for an accommodation.

Id. (cleaned up).

39. This is known as the most favored nation principle, an analogy from international trade law.

40. Defendant fell far short of this requirement by treating religious beliefs less

10

favorably, rather than more favorably (or even equally), than non-religious beliefs, specifically in the area of preferred medical exemptions.

41. An example of the governing legal principle is F.O.P. Lodge 12, where Justice (then-Judge) Alito wrote unequivocally for the Third Circuit that –

> [b]ecause the Department makes exemptions from its [no beards] policy for secular [medical] reasons and has not offered any substantial justification for refusing to provide similar treatment for officers who are required to wear beards for religious reasons, we conclude that the Department's policy violates the First Amendment.

170 F.3d at 360.

42. First Amendment cases such as F.O.P. Lodge 12 are especially instructive on this issue because then-Judge Alito expressly grounded his disparate treatment analysis and legal rationale in a discussion of the identical accommodation requirements imposed by the Americans with Disabilities Act for medical exemptions, and Title VII for religious ones and explained how different results under substantively identical statutes demonstrates blatant discrimination against religion.

43. Defendant would argue that it was required to provide accommodations for medical reasons, under various federal laws, including the Americans with Disabilities Act, and thus its admittedly disfavored treatment of religious accommodations for Plaintiff was justified.

44. But this very argument was specifically addressed and soundly rejected in F.O.P. Lodge 12.

> It is true that the ADA requires employers to make "reasonable accommodations" for individuals with disabilities. However, Title VII of the Civil Rights Act of 1964 imposes an identical obligation on employers with respect to accommodating religion. This parallel requirement undermines the Department's contention that it provides a medical exception, but not a religious exception, because it believes that the law may require a medical exception. Furthermore, it is noteworthy that the Department has clearly been put

11

>on notice of Title VII's religious accommodation requirements. In light of these circumstances, we cannot accept the Department's position that its differential treatment of medical exemptions and religious exemptions is premised on a good-faith belief that the former may be required by law while the latter are not.

170 F.3d at 365 (cleaned up and internal citations omitted).

45. Thus, Defendant's demonstrated ability and willingness to accommodate medical exemptions but not an religious exemption herein is clearly discriminatory. See F.O.P. Lodge 12, 170 F.3d at 365 ("Therefore, we conclude that [Defendant's] decision to provide medical exemptions while refusing religious exemptions is sufficiently suggestive of discriminatory intent so as to trigger heightened scrutiny under Smith and Lukumi."). And since Title VII requires even more stringent protection from religious discrimination than the First Amendment does, compare Abercrombie, 575 U.S. at 775 (Title VII requires an "affirmative[ ] obligatio[n]" on employers of "favored treatment" towards religion) with Employment Div. v. Smith, 494 U.S. 872, 878-86 (1990) (First Amendment only requires neutrality and general applicability), a discriminatory policy that cannot survive First Amendment inquiry necessarily cannot survive Title VII's demands.

46. The Sixth Circuit recently reached a conclusion identical to Justice Alito's, but specifically in the context of COVID-19 vaccination requirements.

47. In Dahl v. Bd. of Trs. of W. Mich. Univ., 15 F.4th 728 (6th Cir. 2021), the Court found that the granting of medical exemptions to COVID-19 vaccination requirements, while refusing religious exemptions, was discriminatory. Id. at 733-35.

48. Justice Alito's opinion for the Third Circuit in F.O.P. Lodge 12 hardly represents a novel proposition.

49. As the Sixth Circuit has explained, "a double standard is not a neutral standard." Ward v. Polite, 667 F.3d 727, 740 (6th Cir. 2012).

50. And, if a double standard cannot even satisfy the less demanding neutrality requirements under the First Amendment, it can hardly satisfy the more demanding, favored treatment, requirements of Title VII.

51. Many courts have recognized that allowing medical exemptions while prohibiting religious exemptions is unconstitutional. See, e.g. Litzman v. N.Y. City Police Dep't, 2013 WL 6049066, at *3 (S.D.N.Y. Nov. 15, 2013) (holding that a policy that permits medical exemptions but not religious exemptions is neither neutral nor generally applicable and must be subject to strict scrutiny); Singh v. McHugh, 185 F.Supp.3d 201, 225 (D.D.C. 2016) ("In sum, it is difficult to see how accommodating plaintiff's religious exercise would do greater damage to the Army's compelling interests in uniformity, discipline, credibility, unit cohesion, and training than the tens of thousands of medical shaving profiles the Army has already granted."); Cunningham v. City of Shreveport, 407 F.Supp.3d 595, 607 (W.D. La. 2019) (allowing medical exemptions while precluding religious exemptions removes law from neutrality and general applicability).

52. Defendant's favored treatment of medical exemptions while excluding the religious exemption herein plainly violates Title VII.

53. The clarification of the governing legal principles concerning religious discrimination that arose during the COVID-19 pandemic makes that certain. See Fulton v. City of Phila., 141 S.Ct. 1868 (2021); Tandon v. Newsom, 141 S.Ct. 1294 (2021); Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S.Ct. 63 (2021).

54. The Fulton principle here for our case is that when a rule of general applicability,

which burdens religious exercise, provides for individualized exemptions from that rule, but did not allow exemption based upon religious reasons, only strict scrutiny can justify the rule. 141 S.Ct. at 1877-82.  Since medical exemption herein was provided in the rule, religious objection must also be allowed, even if an entirely different religion's beliefs dictate a different religious practice.

55. Tandon also stated the following legal principles governing religious discrimination claims. "First, government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise." 141 S.Ct. at 1296.

56. Here medical exemptions were being treated more favorably than religious claims. At least three nurses were given medical exemptions to the vaccination requirement of the Defendant.  And here as written the policy itself grants medical exemptions.

57. "Second, whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." Id.

58. Comparability is concerned with the risks various activities pose, not the reasons why people gather. Id.

59. For Defendant allowing an unvaccinated person on campus for medical reasons presents the same risk as allowing an unvaccinated person for religious reasons.  To not allow both persons on campus constitutes religious discrimination under Title VII.

60. Defendant cannot credibly contend that medical exemptions to COVID-19 vaccination are not similar or comparable to religious exemptions, and thus could be treated

14

more favorably. Quite obviously, if Defendant's goal is indeed to prevent transmission of COVID-19, a religiously exempt employee would pose the same exact risk to transmission as a medically exempt employee (and the same risk as a fully vaccinated employee). The COVID-19 virus does not know why an employee is unvaccinated (or vaccinated).

61. Finally, in Fulton the Court majority also reiterated that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection. Id. at 1876.

62. That should not have been an issue in our present dispute as the religious record was fully documented before Defendant and sincerity should not have been an issue. However, sincerity and truthfulness were an issue and were used illegality against Plaintiff.

63. As a direct and proximate result of the discriminatory treatment he experienced, Plaintiff is suffering the injuries and damages listed in section IV above.

64. Plaintiff's statutory right to be free of discrimination because of religion has been denied under Title VII.

**COUNT II (Title VII - Religion: Pretext Analysis in Discharging Plaintiff Because of his Assembly of God Religious Beliefs While Preferring Roman Catholic Religious Beliefs)**

65. Plaintiff repeats and realleges all paragraphs set forth above.

66. This also is a credibility pretext case. The allegedly legitimate non-discriminatory reasons offered by the Defendant are nowhere found in the contemporaneous documents created at the time. Defendant later asserted them after the fact as a cover up for the real reason which is religious discrimination against a non-Roman Catholic religion because charging party belongs to a disfavored religious denomination which has unpopular religious beliefs opposing the taking

15

of innocent human life through abortion.

67. At least since August 17, 2000 Plaintiff's world wide religious denomination has condemned as sinful the use of aborted embryonic cells for any medical purposes whatsoever, including testing in development of medicines, which obviously includes all COVID-19 related vaccines as Plaintiff documented with his employer.

68. In the Third Circuit Defendant cannot deny or challenge the self evident nature of Plaintiff's prima facie religious beliefs or his sincerity. See Tenafly, 309 F.3d at 171; DeHart, 227 F.3d at 51; Africa, 662 F.2d at 1029.

69. The following prima facie case points to a discriminatory discharge. For religious reasons, Plaintiff applied for an exemption to an employer mandate. He stated the religious reasons. They are sincerely held. They are religious since they are taught by his world-wide religious denomination. He also has engaged in religious missionary activity in his adult life which demonstrates his sincerity. Then he was fired and reasons relied upon include teachings of the Roman Catholic Church, a different religion. But at the same time at least one and perhaps three Roman Catholic employees of defendant were granted religious exceptions.

70. A jury can draw an inference of religious discrimination from this prima facie case and this adverse action.

71. The excuse for his firing is a pretext for punishing Plaintiff for his disfavored religious beliefs which revolved around the controversial topic of the morality and sinfulness of abortion.

72. Pretext is also demonstrated by Defendant's reliance on Roman Catholic religious teaching on the acceptability of vaccines tainted in their development by the products of abortion.

73. But then Defendant granted religious exemption from its vaccination requirement to numerous Roman Catholics who nonetheless had objection to the vaccines in question.

74. Plaintiff is an able male adherent to the Christian denomination known as the Assemblies of God.

75. Plaintiff was qualified for continued employment with Defendant.

76. At all times material hereto he was a diligent, honest, and loyal employee who always performed his job in an exemplary manner. His written job evaluations were exemplary.

77. Plaintiff was terminated for religious reasons when the written policy of the Defendant allowed employees a vaccination exception for medical reasons.

78. Any alleged legitimate non-discriminatory reason for the treatment of Plaintiff while allowing exemption for medical reasons is a pretext for intentional discrimination on the basis of religion.

### A. Pretext Analysis.

### 1. Indirect Evidence of Intent.

79. Any reason for this discharge offered by the Defendant is unworthy of credence since Plaintiff can demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the proffered legitimate reasons that a reasonable fact finder can rationally find them unworthy of credence and hence infer that the Defendant did not act for the asserted non-discriminatory reason.

80. The main "contradiction" in the reason for the termination is Defendant's reliance on the Pope and Roman Catholic teaching on the acceptability of the vaccines in question to deny the religious reasons asserted by Plaintiff for his objections. That this is a cover-up is

demonstrated by the fact that numerous Roman Catholic employees were granted religious exemption despite the opposite teaching of their Church.

81. Another such "contradiction" in the reason for Plaintiff's termination is that the paper file created for the termination at the place of employment is contradictory with the reasons given by the Defendant during the limited EEOC investigation of Plaintiff's charge.

82. As a "weakness," Defendant, through its counsel, offered the EEOC the purported religious beliefs of an entirely different religion - Roman Catholicism - to attack Plaintiff's sincerity and to make a mockery of his religion – Assembly of God – and its religious beliefs. Reference were given to its Pope and his church – which is not Plaintiff's church – whose position on vaccines appears to be contrary to its frequent opposition to abortion. But someone else's religious beliefs had no bearing on Plaintiff's, except to show that Defendant was denying his sincerity which cannot be proven in this case.

**2. Direct Evidence of Intent.**

83. Alternatively, Plaintiff can demonstrate pretext because the natural probative force of all direct and circumstantial evidence establishes that it is more likely than not that a motivating or determinative cause of the adverse employment actions was the disfavored religion of the Plaintiff.

84. Defendant admittedly considered "factors such as whether the employee's asserted belief was religious in nature and whether the belief in fact conflicted with receiving the COVID-19 vaccine."

85. This is a direct admission that religion played an impermissible role in this discharge and also an admitted challenge to Plaintiff's sincerity and claim that his beliefs are religious,

18

which thus infects and motivated this termination, all in violation of Title VII.

86. Defendant also had a history of disparate treatment of favored employees over Plaintiff whose religion, differed from Plaintiff.

87. A stated reason for the termination was that Plaintiff was not a Roman Catholic in religious beliefs.

### 3. Circumstantial Evidence of Intent.

88. The circumstantial and direct evidence of intent proves invidious discriminatory purpose. Examples include the following.

89. In handling the termination of Plaintiff there were departures which occurred from the normal procedural sequence.

90. Plaintiff's termination violated numerous policies and procedures of Plaintiff.

91. The specific sequence of events leading up to the immediate termination evidences discriminatory intent.

92. Given the totality of the circumstances, a reasonable fact-finder could conclude that the Defendant intentionally and purposefully treated Plaintiff less favorably than others because of his religion.

93. As a direct and proximate result of Defendants' actions, Plaintiff has been injured.

94. Plaintiff's statutory right to be free of religious discrimination has been denied under Title VII.

**WHEREFORE**, Plaintiff prays that the Court grant the following relief:

A.    Enter a declaratory judgment declaring the actions of Defendant to be violations of federal law.

B.      Issue a permanent injunction requiring Defendant to expunge Plaintiff's personnel files of any derogatory, false, or misleading information relating to this matter;

C.      Award damages in an amount to be determined at trial for lost salary, back pay and front pay, including all incremental pay increases that Plaintiff would have received;

D.      Award damages for reduced pension;

E.      Award damages for lost life insurance and other lost benefits;

F.      Award compensatory damages for out-of-pocket medical expenses;

G.      Award compensatory damages for emotional distress, humiliation, embarrassment, and injury to reputation;

H.      Award punitive damages under Title VII;

I.      Award reasonable attorney's fees, costs, and pre-judgment and post-judgment interest against Defendant; and

J.      Require such other and further relief as is equitable, just, and proper.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
17 Harlech Drive, P.O. Box 4481
Wilmington, DE 19807
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

**MARTIN D. HAVERLY, ATTORNEY AT LAW**

/s/ Martin D. Haverly
**MARTIN D. HAVERLY, ESQ. (#3295)**
2500 Grubb Road, Suite 240B
Wilmington, DE 19810
(302) 529-0121

                                      Martin@HaverlyLaw.com

Dated: December 7, 2022         Attorneys for Plaintiff Matthew Morrison